# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| Brenda M. Reinhart LLC; William L. Ackley; Miriam Ackley; Charles A. Allison; David Atkinson; M. Leslie Boyd; Bradley Briscoe; Matt Bruno; Todd Conner; Stephen Cooney; Marlene Cooney; Walter Cody Cox; Alison Hyland, Trustee for Gladys Lorraine Dameron; Michael DeJohn; TME Investments LLC; Ferguson Investments LLC; Paul Grant; Susan J. Hubele; Craig Brent Hubele; David Hudspeth and Stacey Hudspeth, Trustees of The Hudspeth Living Trust; Corby R. Leach; Kelly L. Leach Reginald Marcellus; Joseph Timothy O'Neill; Jana Michell O'Neill; Mitra Partow-Soroushi; Lisa Rivera; Santos Rivera; Ken W. Skoruppa; Lee G. Snider; Brandy C. Snider; Jerry Weathers; Sheril Weathers; Ricarrdo O. Whitehead; Trudy S. Whitehead; Michael Womac; and Dorothy Ann Womac, | § § § § § § § § § § § § § § § § § § § § § § | Case No. _____ |
| *Plaintiffs*, | § § | |
| v. | § § | |
| Audacy Texas, LLC; Audacy Inc.; iHeart Media, Inc.; Emmis Communications Corporation; Sirius XM Radio Inc., | § § § § § | |
| *Defendants.* | § § § § | |

## ORIGINAL COMPLAINT

Plaintiffs William L. Ackley; Miriam Ackley; Charles A. Allison; David Atkinson; M.

Leslie Boyd; Bradley Briscoe; Matt Bruno; Todd Conner; Stephen Cooney; Marlene Cooney;

Walter Cody Cox; Alison Hyland, Trustee for Gladys Lorraine Dameron; Michael DeJohn; TME

Investments LLC; Ferguson Investments LLC; Paul Grant; Susan J. Hubele; Craig Brent Hubele; David Hudspeth and Stacey Hudspeth, Trustees of The Hudspeth Living Trust; Corby R. Leach; Kelly L. Leach; Reginald Marcellus; Joseph Timothy O'Neill; Jana Michell O'Neill; Mitra Partow-Soroushi; Brenda M. Reinhart LLC; Lisa Rivera; Santos Rivera; Ken W. Skoruppa; Lee G. Snider; Brandy C. Snider; Jerry Weathers; Sheril Weathers; Ricarrdo O. Whitehead; Trudy S. Whitehead; Michael Womac; and Dorothy Ann Womac (collectively, "**Plaintiffs**") file this Original Complaint against Audacy Texas, LLC; Audacy Inc.; iHeart Media, Inc.; Emmis Communications Corporation; and Sirius XM Radio Inc. (collectively, "**Defendants**" or "**Radio Station Defendants**") and would respectfully show the Court as follows:

## PRELIMINARY STATEMENT

Choices have consequences. Here, when certain radio stations made the knowing, reckless, and voluntary choice to provide a platform on their radio airwaves to a known fraud recidivist—Mark Allan Plummer ("**Plummer**")—the consequences of this dangerous decision should come as no surprise. Because of Defendants' choice to broadcast Plummer and provide him with a public platform to spew fraud, ordinary individuals like the Plaintiffs here listened to Plummer's radio show and invested millions of dollars with Plummer and his cronies for purported oil and gas opportunities. Plaintiffs lost all of their investments.

Although the radio stations could have chosen to remove Plummer's radio show from their airwaves after Plummer was punished by FINRA, the Texas Securities Commissioner, and the Securities and Exchange Commission ("**SEC**") over an almost ten-year period, they buried their head in the sand. Therefore, Defendants should now face the consequences of their choices by making the investors whole for the role they played in facilitating Plummer's misrepresentation and fraud.

According to the Texas State Securities Board and the SEC, Plummer is a securities fraud "recidivist" who has been investigated and/or sanctioned by FINRA, the SEC, and state securities boards for operating fraudulent oil and gas investment schemes since at least 2012. Yet, since at least 2015, Plummer hosted a radio show entitled "**Smart Oil and Gas**" on radio stations owned by Defendants Audacy, Inc., Audacy Texas, LLC (collectively, "**Audacy**"), iHeart Media, Inc. ("**iHeart**"), Emmis Communications Corporation ("**Emmis**"), and Sirius XM Radio Inc. ("**Sirius XM**," and collectively with Audacy, iHeart, and Emmis, the "**Radio Stations**"). The Radio Stations' choice to willingly or recklessly ignore publicly-available history and private communications from concerned investors in order to permit a recidivist like Plummer to host his radio show is startling. For example, the table below demonstrates the red flags that the Radio Station Defendants knew or should have known about, and that each of these red flags was publicly available such that even a rudimentary background check or attempt at diligence would have revealed:

| Year | Enforcement Entity | Event |
|---|---|---|
| 2012 | Tex. Sec. Comm'r | Texas Securities Commissioner enters order against Texas E&P Partners (f/k/a Plummer Securities, Inc., f/k/a Chestnut Energy Partners, Inc., f/k/a Chestnut Exploration Partners, Inc.) reprimanding it for failing to comply with procedures and imposing a fine of $50,000 and ordering repayment of $619,469.[1] |
| 2014 | Tex. Crim. System | Emilio Barrera, Jr. (Plummer's right-hand man) indicted and charged with felony offense of aggravated assault with a deadly weapon; plea of *nolo contendere*[2] |
| 2015 | FINRA | FINRA files complaint against Texas E&P Partners and Plummer[3] |

---

[1] https://www.ssb.texas.gov/sites/default/files/files/news/IC12CAF06.pdf
[2] https://obpublicaccess.dallascounty.org/PublicAccessEP1/CriminalCourts/
[3] https://www.finra.org/sites/default/files/OHO_Texas-EP_2014040501801_121316_0_0.pdf

| Year | Enforcement Entity | Event |
|------|--------------------|-------|
| 2016 | FINRA | FINRA enters order finding that Plummer intentionally misused $567,000 from 80 investors and expelled Texas E&P from FINRA membership and barred Plummer from association with a FINRA firm.[4] |
| 2017 | FINRA | From August 2017 to July 2018, Arbitrators awarded more than $2.16 million against Plummer and his companies, including imposing damages for fraud, deceit, and misrepresentations.[5] |
| | U.S. Bankr. Ct. | In November 2017, Plummer's entity files for bankruptcy in the United States Bankruptcy Court for the Northern District of Texas[6] |
| 2019 | Tx. State Ct. | Investor who invested in Plummer's entity after listening to Smart Oil and Gas on Audacy's radio show successfully obtains $1.5 million Final Default Judgment against Plummer for fraudulently inducing the purchase of units in a purported oil and gas investment.[7] |
| | SEC | SEC files civil action styled Securities and Exchange Commission v. Mark Allan Plummer, Civil Action No. 3:19-cv-01538, in the United States District Court for the Northern District of Texas alleging that Plummer defrauded investors by misappropriating investor funds from February 2015 through April 2017 through "widespread misappropriation."  The Court entered a Final Judgment finding Plummer liable for disgorgement and enjoining further violations[8] |
| 2020 | Tex. Sec. Comm'r | Texas Securities Commissioner enters Emergency Cease and Desist Order, Order No. ENF-20-CDO-1810 reciting relevant fact findings and enjoining Plummer, Barrera, and their related entities from engaging in any further fraud in connection with the offer for sale of any security in Texas and that Plummer, Barrera, and their related entities cease from offering securities in Texas through materially misleading statements.[9] |

---

[4] https://www.finra.org/sites/default/files/OHO_Texas-EP_2014040501801_121316_0_0.pdf
[5] https://brokercheck.finra.org/
[6] https://ecf.txnb.uscourts.gov/
[7] https://courtsportal.dallascounty.org/DALLASPROD
[8] https://ecf.txnd.uscourts.gov/
[9] https://www.ssb.texas.gov/sites/default/files/files/news/ENF-20-CDO-1810.pdf

| Year | Enforcement Entity | Event |
|------|--------------------|-------|
| **2021** | **SEC** | SEC files civil action styled Securities and Exchange Commission v. Mark Allan Plummer, et al., Civil Action No. 3:21-cv-02331, in the United States District Court for the Northern District of Texas alleging that Plummer, Barrera, and their related entities engaged in a scheme to defraud more than 70 investors out of over $7 million through unregistered and fraudulent securities, including through publicizing the opportunity through their Radio Show.[10] |

Notwithstanding these and many other publicly available findings and allegations implicating Plummer, Barrera, and their related entities, the Radio Stations turned a blind eye and continued renewing their contract with Plummer year after year.  And year after year, investors listened to the Radio Show and invested in Plummer's fraudulent scheme.  But for the Radio Stations' decision to provide Plummer with a public pathway to fraudulently steal millions of dollars through providing a radio platform, the Plaintiffs in this lawsuit would have never invested with Plummer and would have never lost their hard-earned money.  Simply put, it was the Radio Stations that provided the lynchpin for Plummer to continue his fraud.

Plummer's success in soliciting monies from investors for his fraudulent scheme is directly attributable to Defendants' recklessness, as described below, and the material aid Defendants provided to Plummer and his entities.  Defendants served as the primary means for Plummer and his entities to solicit investors and create a public persona of a trusted adviser.  Accordingly, the Radio Stations' choices come with the unsurprising consequences of providing a gateway for so many individuals to lose their money.  And the Radio Stations should be liable for the millions of dollars of harm caused by their misconduct.

---

[10] https://ecf.txnd.uscourts.gov/

**ORIGINAL COMPLAINT**                                                                                   **Page 5**

## PARTIES

**A. Plaintiffs**

1.          Brenda M. Reinhart LLC is a Texas limited liability company who invested $140,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in or around Carrollton, Texas.

2.          Plaintiffs William and Miriam Ackley are individuals who reside in Harris County, Texas and who invested $35,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on KTRH 740 AM owned by iHeart Media, Inc in Houston, Texas.

3.          Plaintiff Charles A. Allison is an individual who resides in Scioto County, Ohio and who invested $100,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on a station owned by Sirius XM Radio Inc. in Ohio.

4.          Plaintiff David Atkinson is an individual who resides in Collin County, Texas and who invested $35,000.00 with PRT in connection with the Beeler well(s) after listening to Plummer's radio show on KRLD AM 1080, owned by Audacity LLC in Houston, Texas.

5.          Plaintiff M. Leslie Boyd is an individual who resides in Travis County, Texas and who invested $70,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on KLBJ owned by Emmis Communications Corporation in Austin, Texas.

6.          Plaintiff Bradley Briscoe is an individual who resides in King County, Washington and who invested $192,500.00 with PRT in connection with the Beeler 1H well after listening to a radio advertisement on SiriusXM for an entity connected directly to Plummer and listening to Plummer's radio show in Renton, Washington.

7.          Plaintiff Matt Bruno is an individual who resides in Montgomery County, Texas and who invested $236,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells

after listening to Plummer's radio show on on a station owned by Sirius XM Radio Inc. in Houston, Texas.

8.      Plaintiff Todd Conner is an individual who resides in Roanoke County, Virginia who invested $188,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on a station owned by Sirius XM Radio Inc.

9.      Plaintiffs Stephen and Marlene Cooney are individuals who reside in Midland County, Texas who invested $188,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on a station owned by Sirius XM Radio Inc.

10.      Plaintiff Walter Cody Cox is an individual who resides in Smith County, Texas who invested $140,000.00 with PRT in connection with the Beeler 2H after listening to Plummer's radio show on stations across Texas owned by Audacy Texas, LLC.

11.      Alison Hyland, as Trustee for the Estate of Gladys Lorraine Dameron, is an individual who resides in Llano County, Texas who invested $100,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on a station owned by Sirius XM in Llano County, Texas.

12.      Plaintiff Michael DeJohn is an individual who resides in Los Angeles County, California, who invested $35,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on SiriusXM Fox Business Channel, 77ABC podcasts, and Patriot AM1150 in Los Angeles, California.

13.      Plaintiff TME Investments, LLC is a Texas limited liability company that invested $478,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on KTRH 740 AM owned by iHeart Media, Inc in Houston, Texas.

14.     Plaintiff Cardiovascular Coverage, LLC is a Texas limited liability company that invested $50,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on on a station owned by Sirius XM Radio Inc.

15.     Plaintiff Ferguson Investments LLC is a Texas limited liability company that invested $96,000.00 with PRT in connection with the Beeler 1H well after listening to Plummer's radio show on KRLD AM 1080, owned by Audacity LLC.

16.     Plaintiff Paul Grant is an individual who resides in Hillsboro County, New Hampshire who invested $105,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on a station owned by Sirius XM Radio Inc.

17.     Plaintiff Susan Johnson and Craig Brent Hubele are individuals who reside in Denton County, Texas who invested $35,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in or around Flower Mound, Texas.

18.     Plaintiffs Stacey and David Hudspeth, as Trustees of the Hudspeth Living Trust are individuals who reside in Harris County, Texas who invested $74,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on 740am KTRH owned by iHeart Media, Inc. in Houston, Texas.

19.     Plaintiffs Corby Leach and Kelly Leach are individuals who reside in Hocking County, Ohio who invested $236,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on a station owned by Sirius XM Radio Inc.

20.     Plaintiff Reginald Marcellus is an individual who resides in Dallas County, Texas who invested $48,000.00 with PRT in connection with the Beeler 1H well after listening to

Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in or around Rowlett, TX (DFW) area.

21.     Plaintiff Joseph Timothy and Jana Michell O'Neill are individuals who reside in Harris County, Texas who invested $35,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on on KTRH 740 AM owned by iHeart Media, Inc in Houston, Texas and on a station owned by Sirius XM Radio Inc.

22.     Plaintiff Mitra Partow-Soroushi is an individual who resides in Collin County, Texas who invested $50,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in Plano, Texas.

23.     Plaintiffs Lisa and Santos Rivera are individuals who reside in Bandera County, Texas who invested $96,000.00 with PRT in connection with the Beeler 1H well after listening to Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in or around in Argyle, Texas.

24.     Plaintiff Ken Skoruppa is an individual who resides in Nueces County, Texas who invested $83,000.00 with PRT in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on to Plummer's radio show on a station owned by Sirius XM Radio Inc.

25.     Jerry and Sheril Weathers are individuals who reside in Grimes County, Texas, who invested $140,000.00 with PRT in connection with the Beeler 2H well after listening to The Smart Oil and Gas radio show on 740 KTRH out of Houston, Texas.

26.     Plaintiffs Ricarrdo and Trudy Whitehead are individuals who reside in Fulton County, Georgia who invested 30,000.00 with PRT in connection with the Beeler 2H well after listening to Plummer's radio show on KRLD 1080 owned by Audacy Texas, LLC in Dallas-Fort Worth, Texas.

27.     Plaintiffs Michael and Dorothy Ann Womac are individuals who reside in Denton County, Texas who invested $262,000.00 in connection with the Beeler 1H and Beeler 2H wells after listening to Plummer's radio show on 1080 KRLD owned by Audacy Texas, LLC in Trophy Club, Texas.

**B.   Defendants**

28.     Defendant Audacy Texas, LLC is a Delaware limited liability company with its principal office in Dallas, Texas.  Audacy Texas, LLC may be served with process via its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

29.     Defendant Audacy, Inc. is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  Audacy, Inc. may be served with process via its registered agent, CT Corporation System, 600 N 2nd St, Ste 401, Harrisburg PA 17101.

30.     Defendant iHeart Media, Inc. is a Delaware corporation with its principal place of business in San Antonio, Texas.  iHeart Media, Inc. may be served with process via its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

31.      Defendant Emmis Communications Corporation is an Indiana corporation with its principal place of business in Indianapolis, Indiana.  Defendant Emmis Communications Corporation may be served with process via its registered agent, Patrick M. Walsh, 40 Monument Circle, Ste. 700, Indianapolis, IN 46204.

32.     Defendant Sirius XM Radio Inc. is a Delaware corporation with its principal place of business in New York, New York.  Defendant Sirius XM Radio Inc. may be served with process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Street, Wilmington, DE 19801.

## VENUE AND JURISDICTION

33.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 because the Complaint raises federal questions.   Personal jurisdiction is appropriate against Defendants because Defendants regularly and systematically conduct business in Texas and are generally subject to jurisdiction in Texas.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Specifically, for example, a majority of the Plaintiffs in this lawsuit reside within this district and listened to the subject radio show on radio stations within this district.   Moreover, the fraudulent scheme discussed herein and the participants in the fraudulent scheme reside in this district.

## FACTUAL BACKGROUND

A.     **The Parties**

35.     Plaintiffs are the victims of a fraudulent investment scheme that the Radio Stations recklessly and/or knowingly allowed to be broadcast on their airwaves, including as recently as this year.   During various points in time, Plaintiffs listened to the Smart Oil and Gas radio show on the Radio Stations' airwaves and based on the radio show, invested their hard-earned funds into a scheme that resulted in a total and complete loss.   But for the Radio Stations' reckless disregard for the veracity of the Smart Oil and Gas radio show, Plaintiffs would never have suffered their enormous financial loss.

36.     Plummer is a licensed petroleum engineer who has been involved in a series of failed companies and investments related to oil and gas ventures.   Plummer is the President and owner of Richmond Engineering, Inc. ("**Richmond Engineering**").   Richmond Engineering owns oil and gas interests.   Plummer and Richmond Engineering also control Smart Oil and Gas.   Smart

Oil and Gas has been acting as a sales agent for Petroleum Resources of Texas. Plummer and Smart Oil and Gas actively solicit investors (like Plaintiffs) through radio advertisements and a radio program available on Defendants' radio stations.

37.     Emilio Barrera, Jr. ("**Barrera**") is the managing member and president of PRT Consulting, LLC, d/b/a Petroleum Resources of Texas ("**Petroleum Resources**") and has been offering investments tied to an oil and gas drilling program. In or around December 2017, after working as a salesperson for two of Plummer's now defunct oil and gas companies, Barrera acquired Petroleum Resources to use as a vehicle to raise money for oil and gas projects. Barrera owns Petroleum Resources and is its President and Managing Member.

38.     Todd Prince, George Rauch, and Todd Stuart Breitling were also members of Plummer's fraudulent scheme by serving as salespersons who Plaintiffs were directed to after listening to the Smart Oil & Gas Radio Show.

39.     Defendants are Radio Stations that permitted Plummer's Radio Show, "Smart Oil and Gas" to be aired on its radio station. For example, Plummer became a customer with KRLD NewRadio 1080 ("**KRLD**") in or around December 2014. Plummer hosted his hour-long radio on KRLD starting in the fall of 2015.

**B.      The Radio Station Defendants Sold Airtime to Plummer and his Cronies, Accepted Proceeds from Plummer, Reviewed Scripts, and Knowingly or Recklessly Ignored Plummer's Issues.**

40.     Radio stations like KRLD admit that the Radio Station knew of the contents of the Radio Show and knew that the show ultimately invited listeners who were interested in learning

about potential investment opportunities to contact Plummer or Petroleum Resources by phone or by visiting a website.[11]

41.    Generally, the Radio Stations like KRLD reviewed the scripts for the Smart Oil and Gas Radio Show, along with the recordings of the advertising spots, in advance of any airing in order to ensure compliance with the company's broadcasting standards.[12]  For example, KRLD admits that, on occasion, its personnel would offer ideas to Plummer for his Radio Show, including for content or notes on grammar and radio timing.[13]  KRLD also provided the studio space and equipment for Plummer's broadcast, and technical support on how to use the equipment.[14]  In less than three years, KRLD (by itself) made more than $500,000 on fees paid by Plummer and his entities for hosting the Radio Show.[15]  Upon information and belief, the other Radio Station Defendants engaged in similar conduct in reviewing scripts and selling and accepting funds from Plummer and/or his entities to permit broadcast of the Smart Oil and Gas Radio Show.

42.    Despite repeated instances of findings and allegations implicating Plummer, Barrera, and their companies' lack of character and honesty, radio stations such as those owned by Defendants continue—*to this day*—to include references and links to the Smart Oil and Gas show.[16]

---

[11] Declaration of Bob Waterman (the "**Waterman Decl.**") filed at Dkt. No. 80-1 in the case styled *Yaquinto v. CBS Radio, Inc., et al.*, Adv. Pro. No. 19-03226-SGJ, in the United States Bankruptcy Court for the Northern District of Texas
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *See, e.g.,* https://ktrh.iheart.com/featured/smart-oil-and-gas/about/ (last visited Nov. 2, 2021); https://www.audacy.com/krld/authors/smart-oil-gas-show (last visited Nov. 18, 2021).

**ORIGINAL COMPLAINT**                                                                 **Page 13**

 

C.      **Plummer Utilizes Radio Show to Acquire Investors for Well Projects**

43.      As asserted by the SEC, on or about July 25, 2018, Plummer, through Richmond Engineering, purchased leases and interests related to the East Texas 2H and Salmon 2W well projects.  These two well projects were at issue in the SEC's 2019 enforcement action against Plummer.  This included leases and interests in what are known as the "Beeler Wells."

44.      Around the same time, Barrera connected with Plummer.  Petroleum Resources agreed to purchase from Richmond Engineering a portion of the working interests in the wellbores for the Beeler Wells.

45.      To fund its purchase from Richmond Engineering of the working interests in the Beeler Wells, Petroleum Resources conducted unregistered offerings to sell units of joint venture interests ("**Units**") in two purported joint ventures, one for each well – the Beeler 1H Joint Venture and the Beeler 2H Joint Venture.  Petroleum Resources purportedly served as the Managing Venturer for both the Beeler 1H and the Beeler 2H Joint Ventures.

i.      Beeler 1H Joint Venture

46.      The Beeler 1H Joint Venture claims to be a joint venture whose objective is to complete and produce one horizontal well (the Beeler 1H) to develop the Subclarksville Sand in the Elkhart Field in Anderson County, Texas.  The Beeler 1H offering brochure states that the offering was making 75 Units available to investors at a cost of $48,000 per unit.

**ORIGINAL COMPLAINT**                                                                                          **Page 14**

ii.   Beeler 2H Joint Venture

47.    The Beeler 2H Joint Venture claims to be a joint venture dedicated to drilling a horizontal oil well (the Beeler 2H) to develop the Subclarksville Sand in the Elkhart Field in Anderson County, Texas, and whose location would offset the Beeler 1H well.  The Beeler 2H offering brochure states that the offering was making 58 Units available to investors at a cost of $140,000 per unit.

**D.    The Radio Stations Knowingly and Recklessly Permit Plummer to Funnel Innocent Investors to Plummer's Fraudulent Oil and Gas Investment Scheme.**

48.    Plummer and Richmond Engineering were the source for nearly all of Petroleum Resources' investors.  Plummer hosted the Smart Oil and Gas radio show (the "**Radio Show**") and related radio advertisements.  The Radio Show aired weekly beginning in 2015 and continues, at least for some stations, to this day.  For example, the Radio Show broadcast on KRLD serving the Dallas, Texas area, NewsRadio 740 KTRH serving the Houston, Texas area, and The Patriot AM 1150 serving the Los Angeles, California area.  Ultimately, the show and advertisements aired nationwide.

49.    As part of the Radio Show, Plummer concealed his identity, often referring to himself as the "Boss."  Shrouding his true identity in secrecy, Plummer touted the benefits of oil and gas investments without discussing any specific entity or offering.  Plummer encouraged his listeners to call into the show to get more information.  When interested listeners contacted the phone number provided on the Radio Show, they were routed to Petroleum Resources and its sales team (including Prince, Breitling, and Rauche), who were marketing the offerings.

50.    Plummer did not tell listeners about his connection to the offerings or Petroleum Resources, other than to mention that Petroleum Resources sponsored the Radio Show.  Of course, while Plummer did not disclose his true identity to his listeners, the Radio Stations had actual

knowledge of the man behind the microphone, and had either actual or constructive knowledge of his prior fraudulent dealings.

51.     After a prospective investor listened to the Radio Show and called or inquired further based on the information provided by Plummer, a Petroleum Resources salesperson would field the call from the prospective investor.  The salesperson outlined the investment opportunity in the Beeler 1H Joint Venture or Beeler 2H Joint Venture.  Thereafter, the salesperson would send out investment packets to the potential investor and direct the investor to send funds by check or wire.  The packet would typically include the brochure, subscription documents, conversion table, wiring instructions, and, in some instances, a Confidential Information Memorandum ("CIM"). The conversion tables portrayed an investor making multi-millions of dollars from any prospective investment.  Having just listened to the Radio Show describe these purported benefits, victims like the Plaintiffs were lured into investing based on the appearance of credibility through the ongoing airing of Smart Oil and Gas Radio Show.

52.     For the Beeler 2H Joint Venture, for example, the marketing brochure represented that the objective was to drill one new horizonal oil well to "further develop the Subclarksville Sand in the Elkhart Field, Anderson County, Texas."  The marketing brochure discussed how the well would be "drilled to approximately 6,200 feet of vertical depth and will have a horizontal lateral section of approximately 3,000 feet.  The proposed well location is offsetting the Beeler 1H well, which had initial production rates of over 600 barrels of oil per day."  After explaining that certain vertical wells drilled in the same locations were "prematurely plugged," the marketing brochure states, "[o]ur modern engineering analysis estimates that the wells only produced about 2.2 million barrels of the 64 million barrels of oil originally in place."  Thus, the marketing brochure states that it was their analysis that "the Beeler 2HJoint Venture well should initially

produce at 2,000 barrels of oil per day and ultimately recover up to 2,000,000 barrels of oil." Finally, the marketing brochure touted certain tax benefits by stating, "[u]nder the Tax Cuts and Jobs Act, the tax code allows for investors to deduct against ordinary income 100% of all investment costs in the year the investment is made—including tangible and intangible drilling costs—regardless of the outcome of the well." None of these and many other representations ever came to fruition.

53.     As to the Beeler 1H venture, the marketing brochure discussed how the Beeler 1H well had been "drilled vertically to approximately 6,200 feet and then horizontally, with a later section of approximately 2,500 feet, and is currently awaiting completion operations." Similarly, the brochure stated, "[o]ur engineers are confident that the well could far exceed the original test rate and ultimately recover up to 2,000,000 barrels of oil." Moreover, the brochure stated that, "100% of the lease operating expenses are tax-deductible, and the depletion allowance excludes from taxation the first 15% of gross income." The Conversion Table provided on Beeler 1H represented a potential percent return as high as 443%.

54.     PRT routinely reminded its actual and prospective investors to tune-in to the Radio Show, and further utilized the amount of time the Radio Show had been on the air to tout its reliability. For example, on October 30, 2019, Nick Datoo of PRT emailed Plaintiff Brenda Reinhart LLC stating, "I would like to invite you to listen to our 'Smart Oil and Gas' Radio Show www.smartoilandgas.org. We have been on air for the last four years. The show comes on every Saturday from 11am-12pm Central Time." In an email sent to a separate Plaintiff in December 2019, Datoo encouraged the Plaintiff to listen to the show "live" on any of the following stations:

- "KRLD 1080 = Dallas, Texas = Saturday from 11AM to 12PM."

- "KTRH 740 = Houston, Texas = Saturday from 1PM to 2PM."

- "KLBJ 590 = Austin, Texas = Saturday from 2PM to 3PM."

- "WBAP 820 = Dallas, Texas = Sunday from 5PM to 6PM."

55.     Ultimately, the Radio Stations' reckless permission to allow broadcast of the Radio Show constituted the gateway to the fraudulent scheme, offering Plummer, Barrera, and others a clear path to take advantage of unsuspecting investors based on their purported expertise touted on the Radio Show.  Indeed, PRT represented that the investor's investment would be deposited in a segregated account.  Yet, the funds were commingled.  Based on representations made by PRT, investors understood that the Joint Venture would enter into a Turnkey Drilling and Completion Contract.  Yet, this contract never happened.

56.     Between approximately December 2018 and November 2020, Petroleum Resources raised over $7 million from over 70 investors in approximately 15 states from the sale of the Units, many of which decided to invest after listening to the Radio Show on the Radio Stations.

57.     The investors purchased their Units with cash by check or wire.  The investment funds were used to purchase interests in a common venture – the Beeler 1H Joint Venture or the Beeler 2H Joint Venture – and were commingled.  And, from the outset of the investment, the investors expected to receive profits based on the purported exposure and expertise touted on the Radio Show, a Radio Show that was knowingly and/or recklessly permitted to air by the Radio Stations despite their actual or constructive knowledge of Plummer's and Barrera's unreliability, and their character for untruthfulness.

58.     In the end, Petroleum Resources offered and sold the Units nationwide to the general public, attracting investors by sponsoring radio broadcasts that generated leads for its sales staff who pitched investors in multiple states.  Petroleum Resources did not limit offerees to those

with expertise or experience in oil and gas well projects.  Rather, Plummer and Petroleum Resources utilized their purported experience touted on the Radio Show to give less experienced investors, like many Plaintiffs here, substantial comfort that this was a safe investment.

59.    The investors were numerous, geographically dispersed, and, upon information and belief, most or all: had no prior relationship to one another, did not communicate with one another directly; did not meaningfully participate in managing the venture or developing the well projects; and had no access to information about the well projects except through updates provided by Petroleum Resources.

60.    Barrera and Plummer went to great lengths to hide their tainted past from prospective investors.  Barrera actively concealed from investors Plummer's and Richmond Engineering's involvement.  Barrera reformatted investor updates that Plummer drafted to make it appear as if Barrera drafted them.  In one instance, on or about July 18, 2020, Barrera mistakenly sent investors Plummer's original email along with Barrera's version.  When one investor questioned Barrera about Plummer's role, Barrera responded the next day that Plummer had a "tiny bit of interest [in one of the Beeler wells]" – which grossly misstated Plummer's actual role. Of course, the Radio Stations knew that Plummer was the man behind the microphone that so many investors relied-upon in choosing to invest.  Yet, the Radio Stations readily permitted Plummer and Barrera to use their airwaves to take advantage of unsuspecting investors.

61.    Barrera also actively concealed Plummer's and Richmond Engineering's role in the Beeler 1H and Beeler 2H Joint Ventures.  A reasonable investor would want to know that Plummer – who has a record of regulatory sanctions and previously settled an SEC lawsuit alleging that he misappropriated investor funds – was not only substantially involved with and critical to the success of their investment, but also receiving investor funds.

**ORIGINAL COMPLAINT**                                                                                          **Page 19**

**E.**     **The Radio Show Served as the Lynchpin for Plummer's Fraud**

62.     Plummer was the originating source for nearly all of the investors. As alleged above, Plummer hosted the Radio Show and the radio advertisements. Plummer agreed with Barrera that Petroleum Resources would sponsor the Radio Show. Plummer's show and advertisements repeatedly encouraged listeners to call in to get more information about oil and gas investing. By way of example, on June 1, 2019, listeners were told that the show had its senior team that came in every weekend to answer questions and that a live person would answer phone calls; and, on June 20, 2020, listeners were told that the show had its team available for calls just up the road from the studio. As Plummer knew, investors that called the number provided during the show were routed to Petroleum Resources, which had a sales team conducting the offerings.[17]

63.     Plummer also personally conducted training for the Petroleum Resources sales team. In or about January and February 2020, Plummer led a series of in-person training sessions in Richardson, Texas, in which Plummer role-played different types of investors (e.g., doctor, engineer) and then critiqued the Petroleum Resources sales team's skills in attempting to close the sale. During the training, Plummer also worked on improving the sales staff's phone etiquette and demeanor when speaking with potential investors. In addition, Plummer helped the sales team understand the technical aspects of the wells so they could better explain and discuss the well investments. Further, Plummer provided Petroleum Resources with sales script documents to help with their sales pitches.

64.     The Radio Stations offered substantial assistance to Plummer and Barrera's fraudulent scheme, providing the necessary airwaves to reach such a large and unsuspecting

---

[17] Complaint, Dkt. No. 1, *Securities and Exchange Commission v. Mark Allan Plummer, et al.*, Case No. 3:21-cv-02331, in the United States District Court for the Northern District of Texas.

audience.  The Radio Stations knew, or at a minimum, were severely reckless in ignoring, the true background, roles, and scheme touted by Plummer, Barrera, and their related entities on the Radio Show.  Indeed, Plummer knew that his Radio Show was referring investors to the offerings.  He knew that investors calling into the Radio Show would be routed to Petroleum Resources, he communicated by email with one or more of the salespeople about leads generated by the Radio Show, and he held training sessions with and critiqued the Petroleum Resources' sales team. Plummer also knew that he did not disclose his connection to the offerings to investors on the Radio Show or otherwise, and knew, or at a minimum was severely reckless in ignoring, that his and Richmond Engineering's connection to the offerings was not disclosed to investors in the offering materials.

65.    As alleged above, a reasonable investor would consider that Barrera and Petroleum Resources were overstating their credentials and role in the ventures important in deciding whether to invest.  Considering his regulatory history, a reasonable investor would also consider the fact that Plummer was substantially involved with and critical to the success of their investment important in deciding whether to invest in the offerings.

66.    The salespeople and Barrera each solicited and sold Units to individuals in multiple states, including prospective investors who contacted the Petroleum Resources' sales team after listening to the Radio Show.  The salespeople and Barrera provided investors with materials relating to the offering, advised them on the merits of the investments, and closed sales.  They routinely provided investors and prospective investors with information about the Beeler Wells offerings.  Separately, Barrera also helped the salespeople close sales, provided investor updates, and had control over the handling of investor funds.

**F.    The Radio Stations Permitted Plummer's Scheme Despite Plummer and Barrera's Repeated Instances of Misconduct**

67.    The Radio Stations' knowing and reckless conduct concerning the Radio Show, and their ultimate liability for Plaintiffs' losses, is best demonstrated through what the Radio Stations knew or should have known concerning Plummer's and Barrera's past.  Even a minimum amount of diligence through a background check, Google searching, or litigation history searching would have uncovered a treasure trove of red flags warning the Radio Stations to immediately sever all ties with Plummer and Barrera.  The Radio Stations willingly ignored these red flags, ignorance that led directly to Plaintiffs' losses.  The following contains a recitation of these red flags as identified by the Texas Securities Commissioner and SEC.

i.    Barrera's Criminal Proceedings

68.    On or about June 13, 2014, Barrera was indicted in the 204th Judicial District Court in Dallas County, Texas, and charged with the 2nd degree felony offense of aggravated assault with a deadly weapon in Cause No. F-1333943.

69.    Barrera entered a plea of nolo contendere to the charge in *State of Texas v. Emilio Barrera Jr.*, Cause No. F-1333943-T, in the 283rd Judicial District Court of Dallas County, Texas.

70.    The Court found Barrera used a deadly weapon in the commission of the offense and ordered him to serve a four-year term of deferred adjudication community supervision.  The Court also ordered Barrera to pay a fine of $2,000.

71.    On or about October 4, 2017, the Court issued a capias warrant for the arrest of Barrera for violating the conditions of his community supervision.

72.    On or about October 9, 2017, the State of Texas filed a Motion to Revoke Probation or Proceed with an Adjudication of Guilt against Barrera for violating the conditions of his community supervision.

73.     On or about October 12, 2017, the Court ordered Barrera's bond be conditioned on his wearing of an ELM GPS monitoring device.  Barrera wore the ELM GPS monitoring device through on or about February 2, 2018.

74.     On or about June 21, 2018, the State withdrew its Motion to Revoke Probation or Proceed with an Adjudication of Guilt.  On the same day, the Court ordered the extension of Barrera's community supervision through December 16, 2020.

75.     On or about February 17, 2020, the Court again issued a capias warrant for Barrera's arrest.  This capias warrant also charged Barrera with violating the conditions of his community supervision.

76.     On or about February 20, 2020, the State of Texas filed another Motion to Revoke Probation or Proceed with an Adjudication of Guilt against Barrera for violating the conditions of his community supervision.

77.     On or about February 21, 2020, the Sheriff arrested Barrera and Barrera was confined to the Dallas County Jail.

78.     On or about February 27, 2020, the Court ordered that Barrera serve his bond on full house arrest with ELM GPS monitoring until released by the court.

79.     Barrera is still on house arrest and the State's Motion to Revoke Probation or Proceed with an Adjudication of Guilt remains pending against him.

        ii.     <u>2012 Action by Securities Commissioner</u>

80.     Plummer was the President of Texas E&P Partners, Inc., fka Plummer Securities, Inc., fka Chestnut Energy Partners, Inc. fka Chestnut Exploration Partners, Inc. ("**<u>Texas E&P Partners</u>**").

81.     Texas E&P Partners was previously registered as a dealer with the Securities Commissioner.

82.     On or about January 10, 2012, the Securities Commissioner entered Order No. IC12-CAF-06 against Texas E&P Partners.  The order found that:

- Texas E&P Partners engaged in the sale of interests in oil and gas joint ventures and limited partnerships managed by its affiliates;

- Texas E&P Partners sold interests in Chestnut Production Fund II, L.P. (the "**Fund**") to investors;

- The Fund purchased a property from Chestnut Petroleum, an affiliate, for $664,469 plus a seven percent acquisition fee even though Chestnut Petroleum had acquired the property for $45,000;

- The sale was contrary to the Fund's private placement memorandum and rendered the Fund's private placement memorandum inaccurate; and

- Texas E&P Partners did not enforce its written supervisory procedures because Plummer did not conduct any review or interviews to determine the accuracy and completeness of the information in the Fund's private placement memorandum after the purchase of the property.

83.     The Securities Commissioner reprimanded Texas E&P Partners and assessed an administrative fine of $50,000 against it.  The Securities Commissioner also ordered Texas E&P Partners to comply with an undertaking that required it to repay $619,469 to the Fund.

   iii.   FINRA Bars Plummer and his Company from the Securities Industry

84.     As referenced herein, Texas E&P Partners was previously registered as a broker-dealer with FINRA.

85.     On or about July 21, 2015, FINRA filed a complaint against Texas E&P Partners and Plummer in *Department of Enforcement v. Texas E&P Partners, Inc. f/k/a Chestnut Exploration Partners, Inc. f/k/a Chestnut Energy Partners, Inc., and Mark Plummer*, Disciplinary Proceeding No. 2014040501801.

**ORIGINAL COMPLAINT**                                                                                       **Page 24**

86.     On or about December 13, 2016, a Hearings Officer for an Extended Hearing Panel entered an Extended Hearing Panel Decision that found as follows:

- Plummer intentionally misused $567,110 raised from more than 80 investors in an oil and gas investment program and failed to repay the misused funds to investors; and

- Plummer, intentionally or recklessly, gave false and misleading testimony during the course of FINRA's investigation.

87.     The Extended Hearing Panel ordered as follows:

- It expelled Texas E&P Partners from FINRA membership;

- It barred Plummer from association, in any capacity, with any FINRA member firm; and

- It ordered Plummer to pay restitution plus pre-judgment interest to affected customers.

     iv.   Arbitrators Award Multi-Millions of Dollars Against Plummer and His Companies.

88.     Plummer and Texas E&P Partners were named as respondents in FINRA Arbitration Case No. 16-00955, wherein:

- The claimants asserted causes of action that included omission of facts, breach of contract, failure to pay dividends, intentional fraud, deceit and misrepresentation; and

- On or around August 31, 2017, the arbitration panel determined the respondents were jointly and severally liable for $299,771.70 in compensatory damages plus interest.

89.     Plummer and Texas E&P Partners were named as respondents in FINRA Arbitration Case No. 16-02150, wherein:

- The claimants asserted causes of action that included, in part, breach of fiduciary duty, misrepresentations, omission of facts.

- On or around June 25, 2018, the arbitration panel determined respondents were jointly and severally liable for $345,000 in compensatory damages.

**ORIGINAL COMPLAINT**                                                                 **Page 25**

90.   Plummer and Texas E&P Partners were named as respondents in <u>FINRA</u> <u>Arbitration Case No. 17-03069,</u> wherein:

- The claimant asserted causes of action that included, in part, breach of fiduciary duty, negligence and gross negligence, material misrepresentations and omissions of fact and unsuitable investment recommendations.

- On or around July 7, 2018, the arbitrator determined respondents were joint and severally liable for $521,000 in compensatory damages and $1 million in punitive damages.

v.   <u>Plummer's Oil and Gas Business Files for Bankruptcy</u>

91.   Plummer was the President of Texas E&P Operating, Inc., fka Chestnut Exploration and Petroleum, Inc., fka Chestnut Petroleum, Inc. ("**Texas E&P Operating**").

92.   On or about November 29, 2017, Texas E&P Operating filed a petition for Chapter 11 Bankruptcy in Case No. 17-34386-sgj-7, in the United States Bankruptcy Court, Northern District of Texas, and the bankruptcy case is still active.

93.   On or about January 17, 2018, the Court appointed a Trustee and, on or about January 23, 2019, the Court appointed a successor Trustee.

94.   On or around July 27, 2018, the Court converted the case from a Chapter 11 Bankruptcy to a Chapter 7 Bankruptcy.

95.   On or about November 27, 2019, the Trustee filed Trustee's Original Complaint against Plummer and others, alleging over 160 trade creditors, governmental agencies, taxing authorities and investors filed claims totaling more than $20 million.

96.   On or about April 27, 2020, the Trustee filed Trustee's First Amended Complaint against Plummer and others.  It prayed for judgment for various claims and causes of action, alleging in part as follows:

- Plummer controlled Texas E&P Operating and various other entities that operated as one integrated entity often called the Texas E&P Group of Companies;

- The Texas E&P Group of Companies sold private placement investments in oil and gas drilling ventures to investors;

- Beginning in or around 2014 and continuing through the filing of the bankruptcy petition, the Texas E&P Group of Companies was "experiencing complete economic meltdown" due to two expensive and unsuccessful oil wells in Anderson County, Texas, the expense of defending dozens of lawsuits filed by creditors and investors and the expulsion of Plummer from FINRA;

- Despite the "economic meltdown," the Texas E&P Group of Companies continued paying for sporting events, travel, conferences and personal expenses such as college tuition, and they continued paying large amounts of money to a law firm for work for Plummer's personal benefit; and

- Although Texas E&P Operating was insolvent for years and unable to pay creditors, it still paid millions of dollars to Plummer and his other entities.

97.     On or about November 26, 2019, the Trustee filed a complaint against Barrera in Case No. 19-03218-sgj.  The complaint prayed for the recovery of $145,339.21 from Barrera and alleged as follows:

- Barrera received transfers at the direction of Plummer and other employees of Texas E&P Operating from 2013 through 2017 totaling $145,339.21.

- The transfers were made to Barrera during a period when Plummer and Texas E&P Operating were engaged in fraudulent conduct;

- The transfers were made to Barrera while Texas E&P Operating, Inc. was insolvent; and

- The consideration received by Texas E&P Operating for the transfers to Barrera were not reasonably equivalent in value.

vi. <u>Sales Agent Files Lawsuit Alleging Plummer Stole More than $1.6 million in Investor Money.</u>

98.    On or about October 19, 2018, Enterra Capital Investor Trust filed a petition in *Enterra Capital Investor Trust v. Mark Plummer and Texas E&P Funding, Inc.*, Civil Action No. DC-18-15847, in the 134th District Court of Dallas County, Texas.

99.    The petition alleges common theft, statutory fraud, common law fraud, and misrepresentation based on the following allegations:

- The plaintiff agreed to raise capital for Plummer's oil and gas businesses;

- The plaintiff raised more than $1.16 million for Plummer to use for oil and gas exploration; and

- Plummer instead used the money to further his own purpose and goals.

vii. <u>Court Orders Plummer to Pay More than $1.5 Million to an Oil and Gas Investment Victim</u>

100.    On or about October 19, 2018, an investor filed an Original Petition in *Michael C. Eberhardt v. Mark A. Plummer*, Civil Action No. DC-18-15860, in the 162nd Judicial District Court of Dallas County, Texas.

101.    The plaintiff alleged Plummer induced the purchase of units in a fraudulent oil and gas program as follows:

- The plaintiff learned of the investment through a radio advertisement presented by Plummer on KRLD;

- The plaintiff purchased a 1/2 unit in an oil and gas program for $100,000.00, a 1/4 unit for $37,500.00, and paid $71,250 for completion and testing costs;

- Plummer engaged in a pattern of misleading communications and claimed the well program was experiencing delays; and

- Plummer failed to drill the well.

<u>**ORIGINAL COMPLAINT**</u>                                                                                    **Page 28**

102.    On or about February 25, 2019, following Plummer's failure to Answer Plaintiff's Original Petition, the Court entered a Final Judgment in favor of the plaintiff and ordered Plummer to pay $377,000.00 in actual damages, $1,131,000.00 in exemplary damages and $5,622.91 in attorney fees.

viii.    Securities and Exchange Commission Files Lawsuit Against Plummer in June 2019.

103.    On or about June 26, 2019, the United States Securities and Exchange Commission (the "SEC") filed a civil action against Plummer in *Securities and Exchange Commission v. Mark Allan Plummer*, Civil Action No.: 3:19-cv-01538, in the United States District Court for the Northern District of Texas, Dallas Division.

104.    The complaint alleged, in part, as follows:

- Plummer defrauded investors by misappropriating investor funds from February 2015 through April 2017;

- At least 100 investors from at least 18 different states, including Texas, were solicited and invested with Plummer;

- By April 2017, Plummer had raised $6.1 million and misappropriated $399,011 on country club membership fees, college tuition, income tax, personal travel, a 'racquet club' and other personal expenses; and

- Plummer knowingly, recklessly, or negligently omitted to disclose the "widespread misappropriation" to investors.

105.    On or about July 1, 2019, the Court, with the consent of Plummer, entered a Final Judgment that ordered, adjudged, and decreed as follows:

- Plummer was permanently restrained and enjoined from violating the antifraud provisions of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; and

- Plummer was liable for disgorgement of $399,011.19, together with prejudgment interest of $33,007.93 and a civil penalty of $75,000.

ix.   <u>Investors File Lawsuit Against Plummer and Barrera Claiming Fraud in Sale of Oil and Gas Investments</u>

106.   On or about December 12, 2019, plaintiffs filed suit in *Timothy and Louella Hollingsworth and TNL Holdings, LLC, v. Texas E&P Funding. Inc. F/K/A Chestnut Exploration, Inc. Petroleum Resources of Texas, Richmond Engineering, Inc., Mark Allan Plummer and Emilio "Mike" Barrera. Jr.*, Cause Number DC-19-19780, in the 134th Judicial District of Dallas County, Texas.

107.   The plaintiffs allege Plummer, Barrera, and others are liable for fraud, securities fraud, and violations of the Texas Deceptive Trade Practices Act in connection with an oil and gas investment purchased from Plummer.

x.   <u>The Securities and Exchange Commission Files Second Lawsuit Against Plummer, Barrera, and Their Entities for Violations of Securities Laws</u>

108.   On September 30, 2021, the SEC once again filed a civil action against Plummer, Barrera, and their entities in the case styled, *Securities and Exchange Commission v. Mark Allan Plummer, et al.*, No. 3:21-cv-02331, in the United States District Court for the Northern District of Texas.  The SEC's Complaint includes the following allegations:

- "From approximately November 2018 through September 2020, Plummer and his company (Richmond Engineering) and Barrera and his company (Petroleum Resources) engaged in a scheme to defraud more than 70 investors out of over $7 million through unregistered and fraudulent securities offerings related to two oil and gas well projects."

- "While Plummer did not solicit investors directly, he played a critical role in the fraudulent scheme.  Plummer hosted a weekly radio show about oil and gas investing that generated most of the investments by referring potential investors to Petroleum Resources without disclosing Plummer's hidden connection to the offerings."

- "As part of the Radio Show, Plummer touted the benefits of oil and gas investments without discussing any specific entity or offering.  However, listeners were encouraged to call into the show to get more information.  When interested listeners contacted the phone number provided on the Radio Show, they were routed to

Petroleum Resources and its sales team, who were marketing the offerings. Plummer did not tell listeners about his connection to the offerings or Petroleum Resources, other than to mention that Petroleum Resources sponsored the Radio Show."

109.    In the Complaint, the SEC asserts claims for Violation of Section 10(b) of the Exchange Act and Rule 10b-5, Violation of Section 17(a) of the Securities Act, Violation of Section 15(a) of the Exchange Act, and Aiding and Abetting violation of Section 15(a).

## G.    Failures to Disclose Permitted by Radio Stations

110.    In connection with the offer of units as to Beeler 1H and Beeler 2H, Plummer, Barrera, PRT, Richmond Engineering, and their associated salespeople made numerous material misrepresentations and omissions, including:

- Failing to disclose that Richmond Engineering continued to own a portion of the prospect well after selling an interest in the prospect well to Petroleum Resources.

- Failing to disclose that Richmond Engineering, as an owner of the prospect well, may continue to be responsible for liabilities, including liabilities for personal injuries and damage to the environment.

- Failing to disclose the information set forth herein relating to the criminal prosecution of Barrera.

- Failing to disclose the information set forth herein relating Order No. IC12-CAF-06.

- Failing to disclose the information set forth herein relating to FINRA Disciplinary Proceeding No. 2014040501801, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to FINRA Arbitration Case No. 16-00955, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to FINRA Arbitration Case No. 16-02150, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to FINRA Arbitration Case No. 17-03069, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to Bankruptcy in Case No. 17-34386-sgj-7, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to Enterra Capital Investor Trust v. Mark Plummer and Texas E&P Funding, Inc., Civil Action No. DC-18-15847, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to Michael C. Eberhardt v. Mark A. Plummer, Civil Action No. DC-18-15860, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating to Securities and Exchange Commission v. Mark Allan Plummer, Civil Action No.: 3:19-cv-01538, and this information constitutes material facts.

- Failing to disclose the information set forth herein relating Timothy and Louella Hollingsworth and TNL Holdings, LLC, v. Texas E&P Funding. Inc. F/K/A Chestnut Exploration, Inc. Petroleum Resources of Texas, Richmond Engineering, Inc. Mark Allan Plummer and Emilio "Mike" Barrera, Jr., Cause Number DC-19-19780, and this information constitutes material facts.

111.    As to the Plaintiffs in this litigation, each of these material misrepresentations and omissions were facilitated from one source: The Radio Station Defendants.  Here, the Radio Station Defendants either knew about these issues and chose to ignore them, or recklessly failed

to conduct rudimentary diligence concerning the Smart Oil and Gas Radio Show to stop Plummer's scheme.

**H.**      **Defendants Had Actual and Constructive Notice of the Fraudulent Scheme Promoted on its Airwaves**

112.     Importantly, Defendant Radio Stations cannot claim ignorance of the harm being caused by the Radio Show.  Instead, Defendant Radio Stations received multiple emails from investors, including ones in this litigation, alerting the Radio Stations of Plummer's fraudulent scheme.  Notwithstanding this actual notice, Defendants chose to do nothing.

113.     For example, in October 2017, KRLD received an email from an investor who had listened to the Radio Show, invested money, and realized the scheme was fraudulent.  Despite receiving notice from this investor of Plummer's fraud, Audacy did nothing.  Then, in August 2019, the same investor wrote to the General Counsel at Audacy to once again highlight Plummer's fraud.  Similarly, on or about August 3, 2020, an investor emailed Audacy informing them of the problems associated with the Smart Oil and Gas Radio Show.  Specifically, the investor emailed, "I wanted to bring the Radio.com team's attention to an issue with the podcast "Smart Oil & Gas". They recently have been found to be promoting fraudulent investment schemes in the oil and gas industry, with additional criminal backgrounds and behaviors.  Please see the following article.  I recommend their radio show should be taken down due to the issues now coming to light." Yet, Audacy continued to (and continues to) do nothing to prevent Plummer's ongoing scheme.  Instead, the Radio Station Defendants continue providing Plummer with the platform and the clear pathway to perpetrate his fraud to unsuspecting investors.

114.     Additionally, while Plummer deceptively chose not to disclose his true identity on the Smart Oil and Gas Radio Show, Defendants knew exactly who was on the other side of the microphone.  For example, Plummer himself executed the *2017 Smart Oil and Gas CBS Radio*

*Dallas Broadcast Agreement* relating to his radio show.[18]  Indeed, the overwhelming evidence demonstrates that the Radio Station Defendants knew exactly who they were contracting with in Plummer and knew (or should have known) that Plummer was a recidivist who should have been pulled off the air.  The symbiotic relationship between the recidivist and the Radio Stations speaks for itself in documents like the ones below:



---

[18] *See* Dkt. No. 80-7, in the case styled *Yaquinto v. CBS Radio, Inc., et al.*, Adv. Proc. No. 19-03226-SGJ, in the United States District Court for the Northern District of Texas.  Plummer himself also signed agreements with CBS Radio (n/k/a Audacy) in 2014, 2015, and 2016.  *See id.*, Dkt. No. 80-4, 80-6

**ORIGINAL COMPLAINT**                                                                                    **Page 34**

### CAUSES OF ACTION

A.   **COUNT 1 - AIDING AND ABETTING A VIOLATION OF THE TEXAS SECURITIES ACT**

115.    Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

116.    Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche violated Sections 33A of the Texas Securities Act by selling securities (the investments at issue) by means of an untrue statement of a material fact or by omitting a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.  *See* Tex. Rev. Civ. Stat. art. 581-33A.

117.    In violation of Texas Civil Statutes Article 581-33(A)(2), Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche offered or sold securities by means of untrue statements of material fact and by omitting to state a material fact necessary to make the statements made not misleading (in light of the circumstances under which they were made).

118.    Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche omitted material information that a reasonable investor would want to know, and which would significantly alter the "total mix" of information.  For example, Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche omitted information that Plaintiff's investor funds were used for noninvestment purposes and about Defendant Plummer's involvement and history of securities violations.

119.    Under Texas Revised Civil Statutes Article 581, Section 33F(2), "A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A . . . jointly

and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer."

120.    Here, Radio Station Defendants aided and abetted Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's violations of the Texas Securities Act.   Among other things, the Radio Station Defendants provided material aid to Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche by selling broadcast time on their radio waves year and after year despite Defendants actual and/or constructive knowledge of Plummer's recidivist behavior and fraudulent schemes.  Without a radio station to sponsor his show, Plummer and his cronies would have had no means to perpetrate their fraud.

121.    Radio Station Defendants were generally aware of their role in those violations. They had actual and/or constructive knowledge of Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's fraudulent investment scheme but chose to continue to broadcast the Smart Oil and Gas Show in exchange for payment, attracting new investors to the Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's scheme.

122.    Radio Station Defendants rendered substantial assistance to Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's violations of the Texas Securities Act.  By continuing to broadcast the Smart Oil and Gas Show despite constructive knowledge of Defendants' scheme, Radio Station Defendants directly helped Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche attract new investors to take advantage of.

123.     Radio Station Defendants acted with reckless disregard for the truth or falsity of the representations Plummer, and his cronies made on their program, ignoring red flags that the advertised investment opportunities were part of a fraudulent scheme.

124.     Plaintiffs were damaged by Radio Station Defendants' conduct because they never would have paid for the investments at issue or even heard about them absent Radio Station Defendants' broadcast of the Smart Oil and Gas Show.   Under the Texas Securities Act, Defendants are jointly and severally liable with Plummer because of their material aid to Plummer with the intent to deceive or defraud the investors, or with reckless disregard for the truth or the law.  Plaintiffs are entitled to all actual, compensatory, treble, and exemplary damages permitted by law, along with their attorneys' fees.

## B.     COUNT 2 - NEGLIGENT MISREPRESENTATION

125.     Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

126.     Defendants made representations to Plaintiffs by broadcasting the "Smart Oil and Gas Show," including but not limited to that the radio show, "provides listeners with a roadmap to the oil and gas industry.  Whether you are looking for a basic understanding of how oil and gas has transformed the US and the world or you have specific questions about oil and gas investments and tax savings, you have come to the right place."[19]

127.     Radio Station Defendants made those representations in a transaction in which they had a pecuniary interest, because they are paid to broadcast the "Smart Oil and Gas Show."

---

[19] https://www.audacy.com/krld/authors/smart-oil-gas-show (last visited Nov. 2, 2021)

128.    Plaintiffs are listeners of the "Smart Oil and Gas Show" and Radio Station Defendants' respective stations.  Radio Station Defendants knew that their listeners would receive information broadcast on the "Smart Oil and Gas Show"

129.    Radio Station Defendants broadcast the representations at issue for the guidance of others.

130.    The broadcast representations at issue were misstatements of fact or opinion.

131.    Radio Station Defendants did not use reasonable care in broadcasting the "Smart Oil and Gas Show."  Radio Station Defendants had notice (including from listeners and Plaintiffs) that the investments that callers to the show were persuaded to purchase had suspect qualities, and that personalities and entities affiliated with the show had a history of criminal or fraudulent conduct.  Radio Station Defendants continued to broadcast the show despite this.

132.    Plaintiffs relied on the broadcast representations.  Plaintiffs' reliance was justifiable because they made expenditures based on the representations at issue.  Plaintiffs were persuaded to purchase the investments at issue when they "called in" to the Smart Oil and Gas Show.

133.    Defendants' broadcast representations proximately caused injury to Plaintiffs, which resulted in monetary damages.

134.    Plaintiffs seek damages within the jurisdictional limits of this Court.

C.    **COUNT 3 - VIOLATIONS OF RICO - CONSPIRACY (18 U.S.C. § 1962(a), (c), and (d))**

135.    Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

136.    Defendants, along with Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche constitute an "enterprise" as defined in 18 U.S.C. § 1961(4).  Each of the Defendants is a "person" as defined in 18 U.S.C. § 1961(3).

137.    Through the use of radio broadcasts, websites, the U.S. Mail, overnight delivery services, bank transfers by wire, and through their solicitation of fees from investors like Plaintiffs around the country, the enterprise engaged in, and its activities affected, interstate and foreign commerce.

138.    Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.  Specifically, Defendants conducted and participated in the enterprise's transmission of false information to Plaintiffs to induce them to invest, misuse of Plaintiffs' investor funds, and concealment of material information from Plaintiffs about their investments.

139.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail fraud and wire fraud by transmitting false or misleading information to Plaintiffs about the investments at issue and to induce those purchases in the first place.  18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud).

140.    These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

141.    Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

142.    In violation of 18 U.S.C. § 1962(a), Defendants further used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.  Specifically, Defendants were paid more than $500,000 by Plummer and/or Richmond Engineering.  This money was obtained from the investor funds received via fraud from Plaintiffs and was used by Defendants to continuing airing paid broadcast time to attract new investors for the fraudulent scheme.

143.    In violation of 18 U.S.C. § 1962(d), Defendants agreed to and conspired to violate 18 U.S.C. § 1962(a) and (c).  Defendants intentionally conspired together agreed to use or invest income derived from a pattern of racketeering activity in an interstate enterprise when Plummer and Richmond Engineering paid Radio Station Defendants to broadcast the "Smart Oil and Gas Show" to attract new investors to the fraudulent scheme at issue.  Radio Station Defendants continued to accept payment derived from the investment scheme to broadcast the show, despite being on notice that the advertised investments were fraudulent.

144.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), (c), and (d), Plaintiffs have been injured in their business and property.  Plaintiffs suffered severe financial injury when they were induced to purchase fraudulent investments and their funds were subsequently misappropriated and depleted for noninvestment purposes.

145.    Defendants knew that their predicate acts were part of a racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

146.    Plaintiffs request that this Court enter judgment against Defendants for actual damages, treble damages, and attorney's fees.

**D.**    **COUNT 4 - AIDING AND ABETTING VIOLATION OF RICO**

147.    Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

148.    In the alternative, Radio Station Defendants knowingly and with shared intent sought to and aided and abetted Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche in the commission of predicate acts in the course of a pattern of racketeering activity in violation of RICO as described above.

149.    As a result, Radio Station Defendants are liable for the racketeering violations committed as if they had committed those violations themselves.

150.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property. Plaintiffs suffered severe financial injury when they were induced to purchase fraudulent investments and their funds were subsequently misappropriated and depleted for noninvestment purposes.

**E.**    **COUNT 5 - CIVIL CONSPIRACY**

151.    Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

152.    Defendants conspired together to accomplish an unlawful purpose or to achieve a lawful purpose by unlawful means.

153.    Defendants had a meeting of the minds on the object or course of action. Defendants agreed with Plummer and his cronies to broadcast the "Smart Oil and Gas Show" in exchange for advertising revenue.  Defendants knew that the show concerned oil and gas investment, and that the show would benefit its creators financially by attracting callers and

ORIGINAL COMPLAINT                                                                      Page 41

investors.  Defendants all understood that their course of action was to attract investors via the show, and Defendants were on notice that the investments at issue and sales thereof involved fraud.

154.    In persuading Plaintiffs to purchase the investments at issue via fraudulent misrepresentations and omissions when they called in to the Smart Oil and Gas Show, Plummer and his cronies committed one or more violations of state and federal securities laws, mail fraud, wire fraud, and RICO violations.

155.    Plaintiffs suffered injury as a proximate result of the wrongful act, resulting in the total loss of their investments.

156.    Plaintiffs seek damages within the jurisdictional limits of this Court.

F.    **COUNT 6 - ASSISTING OR ENCOURAGING**

157.    Plaintiffs allege and hereby incorporate by reference each and every allegation made in the paragraphs above as if each was separately set forth below.

158.    In the alternative, Radio Station Defendants assisted or encouraged Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's tort(s) of fraud, mail fraud, wire fraud, RICO violations, negligent misrepresentation, and violation of state and federal securities laws.

159.    Radio Station Defendants knew that Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's conduct constituted a tort.  Radio Station Defendants had constructive knowledge that the investments advertised and sold by the "Smart Oil and Gas Show" they broadcast were fraudulent or involved unlawful conduct.

160.    With the intent to assist Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche in committing the above-named tort(s), Radio Station Defendants gave Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling,

Prince, and Rauche assistance or encouragement.  Specifically, Radio Station Defendants accepted payment from Plummer and Richmond Engineering in exchange for continuing to broadcast the "Smart Oil and Gas Show," knowing that the show was contributing to fraudulent activity.

161.    Radio Station Defendants' assistance or encouragement was a substantial factor in causing Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche's torts.  Plummer, Barrera, Petroleum Resources, Richmond Engineering, Breitling, Prince, and Rauche could not have attracted Plaintiffs as investors and obtained their money if Radio Station Defendants had not continued to broadcast the Smart Oil and Gas Show.

## G.    COUNT 7 - UNJUST ENRICHMENT

162.    Radio Station Defendants were unjustly enriched at Plaintiffs' expense.  Radio Station Defendants received advertising revenue for airing the "Smart Oil and Gas Show."  Radio Station Defendants passively received the benefit of advertising revenue for broadcasting a program which promoted and induced Plaintiffs to purchase fraudulent investments.

163.    It would be unconscionable for Radio Station Defendants to retain the advertising revenue from the Smart Oil and Gas Show in light of the fraudulent activity that it facilitated, which caused Plaintiffs severe financial loss.

## JURY DEMAND.

164.    Plaintiffs hereby demand a trial by jury and submit the required fee in conjunction with this filing.

## PRAYER

For the foregoing reasons, Plaintiff respectfully requests the Court to cite Defendants to appear, and to grant Plaintiffs the following relief:

(1)    Actual and consequential damages as determined at trial on the merits;

(2)    Treble damages;

(3)    Exemplary damages;

(4)    Attorneys' Fees

(5)    Costs of suit, including costs of Court and also expert-witness fees and deposition-copy costs; and

(6)    Any such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.


DATED:  November 19, 2021

                                    Respectfully submitted,

                                    /s/ Joel B. Bailey
                                    Joel B. Bailey
                                    Texas State Bar No. 24069330
                                    Joel@HedrickKring.com
                                    Kodie P. Bennion
                                    Texas State Bar No. 24064882
                                    Kodie@HedrickKring.com
                                    Hedrick Kring, PLLC
                                    1700 Pacific Avenue, Suite 4650
                                    Dallas, Texas 75201
                                    Telephone: (214) 880-9664
                                    Fax: (214) 481-1844

                                    Rebecca L. Gibson
                                    Texas State Bar No. 24092418
                                    Rebecca@HedrickKring.com
                                    Hedrick Kring, PLLC
                                    808 Travis Street, Suite 540
                                    Houston, Texas 77002
                                    Telephone: (832) 871-3370
                                    Fax: (281) 529-7677

                                    **ATTORNEYS FOR PLAINTIFFS**


**ORIGINAL COMPLAINT**                                                    **Page 44**